IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 20-44

Filed: 6 October 2020

Gaston County, No. 17-JB-218

IN THE MATTER OF: A.L.B.

Appeal by juvenile from order entered 20 May 2019 by Judge Michael K. Lands in Gaston County District Court. Heard in the Court of Appeals 26 August 2020.

*Attorney General Joshua H. Stein, by Assistant Deputy Attorney General Melissa K. Walker, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender David W. Andrews, for respondent-appellant juvenile.*

INMAN, Judge.

Amber,[1] a juvenile diagnosed with several mental disorders, appeals from an order committing her to a Division of Adult Correction youth development center after the district court found her responsible for six escapes from youth foster and group homes, at least five vehicle thefts (including two wrecks), and the removal of the ankle monitor that provided the only means for authorities to know her whereabouts.

---

[1] We refer to the juvenile by pseudonym to protect the identity of the minor.

She argues that the trial court erred in failing to refer her to the area mental health services director for appropriate action, as required by statute. After careful review, we agree, vacate the trial court's order, and remand for further proceedings.

## I. Facts and Procedural Background

The evidence of record tends to show the following:

Amber, born on 15 September 2003, was 15 years old at the time of the proceeding below. She had lived for some time with her father, but they had "physical conflicts," and she reported that he engaged in domestic violence and abused alcohol. Eventually Amber's father kicked her out of his home.

Amber then moved in with her mother, who struggled with her own mental health issues. She was unable to control Amber's behavior, and, after Amber stole a car, surrendered her to Gaston County Department of Social Services ("DSS") custody.

DSS initially placed Amber in a series of three Level Two therapeutic foster care homes. Amber ran away from the first two homes, stealing a car on one occasion. She was found responsible and placed on probation for running away and stealing the vehicle. Amber was later transferred out of the third therapeutic foster care home due to its location.

A mental health assessment of Amber in March 2018 noted several diagnoses including post-traumatic stress disorder, depressive disorder, and unspecified

disruptive, impulse-control, and conduct disorder. The mental health counselor who assessed Amber recommended that she be placed in a Level Three home, which would provide around the clock residential services including rules, routine, structure, therapeutic interventions, group activities, and additional therapy.

Amber's therapeutic care and placement was coordinated by Partners Behavioral Health Management ("Partners"), the Managed Care Organization ("MCO") for Gaston County.[2] Partners does not directly provide care, evaluate patients, or recommend appropriate treatments. Instead, licensed care providers conduct any necessary medical evaluations and make treatment recommendations; Partners then steps in, if needed, to identify facilities that provide the recommended treatment and coordinate patient placement with those facilities.

Consistent with the assessment and recommendation in March 2018, Partners authorized placement for Amber in a Level Three group home on 27 April 2018. Partners authorized Amber's placement so that she could receive care according to her Patient Centered Plan ("PCP"), which, per Partners' Care Coordination Supervisor Kendall Higgins, is "a treatment plan that's developed by a clinician and a family . . . that really outlines their treatment goals based on what's recommended in the comprehensive clinical assessment." The group home updated Amber's treatment plan in May, June, July, August, and October 2018.

---

[2] It is unclear from the record what, precisely, prompted Partners to begin coordinating Amber's care.

Amber stole a van from the group home and fled on 13 August 2018, leading to a juvenile petition for larceny of a motor vehicle. After a few days in detention, Amber returned to the group home. She ran away again, leading to another juvenile petition on 16 October 2018. On 5 November 2018, she admitted to delinquency in connection with the larceny petition and was placed on probation for 9 months.

Partners authorized placement in a different Level Three group home, Turn Around Group Home, on 13 November 2018. A different mental health entity, A New Place, took over responsibility for updating Amber's clinical assessment and treatment plan.

Although Amber's first few months at Turn Around seemed promising, she eventually violated the terms of her probation on 3 March 2019 when she failed to charge her ankle monitor, cut it off, and fled the home. She was located in Lincoln County in possession of her grandmother's car before being returned to Turn Around on 1 April 2019. The following morning, Amber stole a van and absconded again. She later crashed the van, stole a truck, and wrecked the truck before being apprehended on 4 April 2019. Juvenile petitions for speeding to elude arrest and felony possession of a stolen vehicle were filed on 4 April and 16 April 2019, respectively.

Amber admitted to possession of a stolen vehicle on 18 April 2019, leading the State to dismiss the petition for speeding to elude arrest. She admitted to her probation violations at a hearing on 6 May 2019. During that hearing, Amber

requested placement in a Level Five psychiatric residential treatment facility ("PRTF").[3] Amber had not previously been placed in a psychiatric facility.

At a disposition hearing on 20 May 2019, Amber's juvenile court counselor recommended that she be committed to the Juvenile Section Division of the Division of Adult Correction for placement in a youth development center ("YDC"), the most restrictive possible disposition. The counselor noted that while in State custody, Amber could receive the same individual and group therapy, medication management, and education available in a residential psychiatric facility. Unlike psychiatric facilities, YDCs are fenced.

Ms. Higgins also appeared at the disposition hearing to testify concerning Amber's mental health history and treatment. She testified that licensed clinical care providers with A New Place had assessed Amber and recommended commitment to a Level Five PRTF, and that Amber had outstanding referrals to several of those facilities. Ms. Higgins testified that she did not have a recent clinical assessment recommending that commitment, and that the most recent clinical assessment available to Partners—from March 2018 —was out of date and "wouldn't be relevant" to determine Amber's current treatment needs. She also testified that YDCs provide psychiatric care "if the juvenile requests it."

---

[3] A Level Five PRTF, unlike lower-level PRTFs, is a locked mental health treatment facility. It is the most restrictive form of therapeutic treatment short of inpatient care. Patients are monitored 24 hours a day and receive schooling, psychiatric therapy, and psychiatric medication management.

After the presentation of evidence, Amber's counsel argued for placement in a Level Five psychiatric residential treatment facility, while the State posited that commitment to a Level Three youth detention center was more appropriate. Amber's counsel also contended that, based on evidence Amber suffered from mental illness, N.C. Gen. Stat. § 7B-2502(c) required the trial court to refer her to the local mental health services director—in this case Partners[4]—who would then be responsible for conducting an interdisciplinary evaluation, mobilizing care, and meeting Amber's needs. The trial court rejected the argument without substantive discussion and ordered a Level Three YDC disposition. Amber entered oral notice of appeal.

## II. ANALYSIS

Amber contends, as she did before the trial court, that her evidence of mental illness required halting disposition for a referral to Partners for "appropriate action," namely, "an interdisciplinary evaluation and [the] mobiliz[ation] of resources to meet [her] needs." N.C. Gen. Stat. § 7B-2502(c). The State acknowledges that the statutorily mandated referral was not made but argues that Amber cannot show prejudice because Ms. Higgins, as a representative of Partners, testified at the

---

[4] The statute in question requires referral to the "area mental health, developmental disabilities, and substance abuse services director," N.C. Gen. Stat. § 7B-2502(c) (2019), a position that no longer exists. *In re E.A.*, ___ N.C. App. ___, ___ n.3, 833 S.E.2d 630, 633 n.3 (2019). A separate statute, N.C. Gen. Stat. § 122C-3, makes the local MCO the "area mental health . . . services director" for purposes of N.C. Gen. Stat. § 7B-2502(c). *See* N.C. Gen. Stat. §§ 122C-3(1) and (20b) (2019) (defining "[a]rea authority" as "[t]he area mental health, developmental disabilities, and substance abuse authority" and "[l]ocal management entity (LME)" as "[a]n area authority"); *E.A.*, ___ N.C. App. at ___ n.3, 833 S.E.2d at 633 n.3 (detailing the interplay of N.C. Gen. Stat. §§ 7B-2502 and 122C-3).

disposition hearing. In sum, the State contends remand is not warranted because Ms. Higgins participated in the hearing, and "[r]emand would only accomplish having the court receive and consider the same information it has already heard."

We hold that Amber has demonstrated reversible error. Consistent with this Court's prior decisions, the trial court was required to refer Amber to Partners for an interdisciplinary evaluation based on her numerous mental health diagnoses. Section 7B-2502(c) provides:

> If . . . there is evidence presented to the effect that the juvenile is mentally ill or is developmentally disabled, the court *shall* refer the juvenile to the area mental health, developmental disabilities, and substance abuse services director for appropriate action. . . . The area mental health, developmental disabilities, and substance abuse director *shall* be responsible for arranging an interdisciplinary evaluation of the juvenile and mobilizing resources to meet the juvenile's needs.

N.C. Gen. Stat § 7B-2502(c) (emphasis added).

In applying the statute, this Court has held that "[t]he use of the word 'shall' indicates a statutory mandate that the trial court refer the juvenile to the area mental health services director for appropriate action, and failure to do so is error." *In re E.M.*, 263 N.C. App. 476, 478, 823 S.E.2d 674, 676 (2019) (citations omitted); *see also E.A.,* ___ N.C. App. at ___, 823 S.E.2d at 632-33 (2019) (vacating and remanding a YDC commitment when the juvenile introduced evidence of mental illness but was not referred to the area mental health services director).

The referral is required if the trial court is "faced with *any* amount of evidence that a juvenile is mentally ill." *E.M.*, 263 N.C. App. at 480, 823 S.E.2d at 677. This is so regardless of the juvenile's past mental health treatment or the availability of mental health services through commitment to a YDC. *See id.* ("It is possible that the trial court was under the misapprehension that such a referral was unnecessary, because Evan had already received significant mental health services prior to this disposition and because the trial court recognized that it could order mental health services for Evan during his commitment."). Though a representative of Partners testified at the disposition hearing, the statute "envisions the area mental health services director's involvement in the juvenile's disposition *and* 'responsib[ility] for arranging an interdisciplinary evaluation of the juvenile and mobilizing resources to meet the juvenile's needs.' " *Id.* (quoting N.C. Gen. Stat. § 7B-2502(c)) (emphasis added). Consistent with *E.M.* and *E.A.*, we hold that the trial court erred in failing to abide by N.C. Gen. Stat. § 7B-2502(c)'s statutory mandate.

Turning to the State's argument that Amber has suffered no prejudice, we are unconvinced that remand would simply have the trial court "receive and consider the same information it has already heard" based on a close examination of the record below. We note that there was no testimony as to whether the "interdisciplinary evaluation . . . and mobiliz[ation of] resources" required by the statute is the same as or equivalent to the coordinated care assessment Amber had received through

Partners at the time of disposition, making any conclusion to that effect conjecture. And, although the State contends the trial court received "Ms. Higgins['s] . . . recommendations for disposition and placement," the transcript reveals that Ms. Higgins could not offer a recommendation herself:

> [MS. HIGGINS]: If I could clarify for the record, Your Honor, our—we do not make the recommendations. These clinical recommendations are made by a licensed provider. We help link and facilitate movement from that client to the recommended level of care. So I wouldn't actually be making the recommendations.
>
> . . . .
>
> I wouldn't determine what the best placement would be. I didn't write the recommendation for the best treatment.

Instead, all that Ms. Higgins relayed to the trial court was her understanding that Amber's licensed healthcare provider's most recent recommendation was—for the first time in Amber's treatment history—placement in a Level Five PRTF. She did not provide the clinician's rationale behind the recommendation, and testified that Partners had not received the latest clinical assessment on which the recommendation was based:

> [MS. HIGGINS]: I don't have any recommendations for placement.
>
> . . . .
>
> [The latest clinical assessment is] not in this packet of information that I have, that was part of our medical

- 9 -

> records, that to my understanding, it was part of what was subpoenaed.
>
> . . . .
>
> We brought everything that was subpoenaed from our medical records that was available to us. . . . It just so happens that part of our medical record did not include this most recent assessment.[5]

In fact, Ms. Higgins testified that Amber's most recent clinical home, *not* Partners, had made and was responsible for pursuing the several referrals to PRTFs that were still outstanding. Ms. Higgins also confirmed that she had never spoken with the clinicians who had conducted the most recent assessment, let alone Amber.

The State notes that the trial court had the benefit of a clinical assessment of Amber dated to March of 2018. That assessment, however, was more than a year old and, according to Ms. Higgins, insufficient to support a current placement recommendation:

> [MS. HIGGINS]: These recommendations from 2018 are what recommended her for the level of care that she was most recently at, the Level Three group home.
>
> . . . .

---

[5] We note that when asked what additional documents besides the clinical assessment she reviewed to prepare for the disposition hearing, Ms. Higgins stated she had "briefly reviewed the addendum that we just got, that was provided to you by A New Place." She later testified that the only documents she reviewed concerning Amber's recommended placement in a psychiatric facility were the March 2018 clinical assessment and treatment plan, and that her testimony was based only on those two documents. It is unclear from the record whether the addendum that Ms. Higgins "just got" pertained to the clinical assessment, treatment plan, or some other healthcare-related document. In any event, the trial court did not receive any information about the most recent clinical assessment beyond Ms. Higgins's understanding that it contained a recommendation for Level Five PRTF placement.

> We would consider [the clinical assessment from] March 2018 to not be active . . . .
>
> . . . .
>
> It includes clinical information that we'd always want to consider, but the recommendations would not be to date. It wouldn't be relevant.
>
> [THE STATE]: Okay.
>
> [MS. HIGGINS]: In terms of a higher level of care.
>
> THE COURT: Let me make sure I understood that. So we should be considering a March [2019] evaluation?
>
> [MS. HIGGINS]: I think in terms of when we look at authorizing care, we would need a recommendation within the last 30 days.

In short, neither Ms. Higgins's testimony nor the documents introduced provided the trial court with evidence regarding why a Level Five PRTF placement, as opposed to commitment to a YDC, was appropriate for Amber based on any clinical evaluations of her mental health needs. The trial court lacked the opportunity to weigh any mental health care clinicians' reasoning against the State's recommendation for commitment to a YDC.

"Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Indiana v. Edwards*, 554 U.S. 164, 175, 171 L. Ed. 2d 345, 356 (2008). It is possible, then, that an updated assessment could show new diagnoses or rationales

for specific treatment that would alter the trial court's ultimate disposition. A year is not insignificant in the mental development of an adolescent.

N.C. Gen. Stat. § 7B-2502(c) "envisions the area mental health services director's involvement in the juvenile's disposition and 'responsib[ility] for arranging an interdisciplinary evaluation of the juvenile and mobilizing resources to meet the juvenile's needs.' " *E.M.*, 263 N.C. App. at 480, 823 S.E.2d at 677-78 (quoting N.C. Gen. Stat. § 7B-2502(c)).[6] While Amber had received some services from Partners— the local mental health services director—and while Ms. Higgins testified about a recent clinical recommendation, it is not evident that the "interdisciplinary evaluation of the juvenile and mobiliz[ation of] resources" called for by the statute had been completed. Given Ms. Higgins's testimony regarding a clinical recommendation that was different than the recommendation a year earlier, and that supported Amber's request to be placed in a psychiatric facility, we hold that Amber has demonstrated a reasonable possibility that compliance with the statute and

---

[6] While the State argues on appeal that the purpose of the statute was vindicated by Ms. Higgins's participation in the hearing, we note that the State actively sought at various points to limit Ms. Higgins's participation considerably. When Amber called Ms. Higgins as a witness, the State protested on the grounds that Amber's counsel had not listed Ms. Higgins on a witness list she voluntarily provided to the State. The State objected to Ms. Higgins's testimony concerning Amber's mental health diagnoses and objected to having her qualified as an expert witness in licensed professional counseling. It later moved to strike all of Ms. Higgins's testimony concerning the March 2018 clinical assessment on the grounds that her expert testimony disclosed the immateriality of the assessment to the most recent Level Five PRTF placement recommendation. We further note that the rules of evidence are relaxed in juvenile delinquency disposition hearings. *See* N.C. Gen. Stat. § 7B-2501(a) (2019) ("The dispositional hearing may be informal, and the court may consider written reports or other evidence concerning the needs of the juvenile. The court may consider any evidence, including hearsay evidence as defined in [N.C. Gen. Stat. §] 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition.").

review of the required evaluation would have resulted in a different disposition. *See In re Bass*, 77 N.C. App. 110, 334 S.E.2d 779, 782 (1985) (holding a juvenile failed to show prejudice because he could not demonstrate "a reasonable possibility that a different result would have been reached at his adjudicatory hearing"); *see also* N.C. Gen. Stat. § 15A-1443(a) (2019) ("A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises."). We therefore vacate the disposition order and remand to the trial court for the referral, interdisciplinary evaluation, and mobilization of resources called for by the statute.

## III. CONCLUSION

For the foregoing reasons, we vacate the disposition order committing Amber to a YDC and remand for further proceedings not inconsistent with this opinion.

VACATED AND REMANDED.

Judge COLLINS concurs.

Judger BERGER dissents by separate opinion.

No. COA20-44 *In the Matter of: A.L.B.*

BERGER, Judge, dissenting by separate opinion.

The majority correctly determined that the trial court erred when it entered a Level III disposition without first referring the juvenile to area mental health services pursuant to N.C. Gen. Stat. § 7B-2502(c).  However, the juvenile has failed to show that she was prejudiced by this error, and I respectfully dissent.

N.C. Gen. Stat. § 7B-2502(c) states in part, "[i]f the court believes, or if there is evidence presented to the effect that the juvenile has a mental illness or a developmental disability, the court shall refer the juvenile to the area mental health . . . services director for appropriate action." N.C. Gen. Stat. § 7B-2502(c) (2019).  N.C. Gen. Stat. § 7B-2502(c) "envisions the area mental health services director's involvement in the juvenile's disposition and responsibility for 'arranging an interdisciplinary evaluation of the juvenile and mobilizing resources to meet the juvenile's needs.' " *In re E.M.*, 263 N.C. App. 476, 480, 823 S.E.2d 674, 678 (2019) (quoting N.C. Gen. Stat. § 7B-2502(c)).

Ms. Kendall Higgins testified for the juvenile at the disposition hearing.  Ms. Higgins was the area mental health services director and the individual to whom the juvenile should have been referred to under Section 7B-2502(c).  Ms. Higgins testified to the recommendations provided by licensed clinical care providers with "A New Place," the juvenile's current healthcare provider.  Additionally, Ms. Higgins testified to the recommendations in the juvenile's person centered plan ("PCP"), and a 2018

clinical assessment of the juvenile was presented to the trial court. According to Ms. Higgins, a PCP is a treatment plan "developed by a clinician and a family. It's supposed to be a joint effort by the client, family [ ], and the provider that really outlines their treatment goals based on what's recommended in the comprehensive clinical assessment." Based on the juvenile's assessments, Ms. Higgins recommended to the trial court that the juvenile be placed in a Level V PRTV in-patient treatment facility.

The juvenile's court counselor testified that the juvenile was a flight risk and that the Department of Juvenile Justice had exhausted all efforts and available services. Based on the juvenile's disposition level, the court counselor recommended that she be placed in a secure Youth Development Center ("YDC").

According to the juvenile's court counselor, the juvenile would not be successful in an in-patient treatment facility as recommended by the area mental health services director. From the testimony of the court counselor, the juvenile's five prior documented incidents as a runaway, her three separate adjudications on new charges, and her admitted drug use, among other factors, were not compatible with the lax security at an in-patient treatment facility. Specifically, the court counselor testified that less restrictive options would not meet the juvenile's risks and needs because the juvenile had stated that "she doesn't care where we put her, she's going to take another car and run away."

The court counselor also testified that the juvenile had violated juvenile probation several times, and "[s]he could've gone to the YDC based on the violation I filed prior to her picking up this newest charge, but we wanted to put her on an ankle monitor and give her an opportunity to be successful." The juvenile cut off the ankle monitor.

The court counselor further testified that he did not recommend commitment to YDCs often. With this juvenile, however, YDC was recommended because "our biggest concern was the number of times she's stolen a car and the danger [to] herself and the community when she's running away, and the choices that she makes when she's not being supervised."

In addition, the court counselor testified that the juvenile would receive the same or similar services at a YDC that were available at in-patient treatment facilities. The primary difference between in-patient treatment and YDC, according to the court counselor, was that a YDC afforded the juvenile and the public greater protection because it was a gated facility. The juvenile's court counselor testified that at a YDC, the juvenile would have access to education, social skills classes, living skills, medication management, and mental health services including individual therapy, group therapy, and psychological evaluations.

After hearing these recommendations and weighing the difference between the in-patient treatment facility and a secure YDC, the trial court placed the juvenile in a secure YDC.

The trial court considered Ms. Higgins' testimony and recommendations for placement of the juvenile. Ms. Higgins, the area mental health services director, is the individual to whom the juvenile should be referred to under Section 7B-2502. If this matter were remanded to the trial court, the juvenile would be referred to the area mental health services director for evaluation. Thus, the majority seeks to send this case back to the trial court for referral to Ms. Higgins so the trial court can again decide between a secure YDC facility and that of the lax security of an in-patient treatment facility. Essentially, the majority seeks to have the trial court weigh the same options.

Further, a trial court is not bound by the recommendations of the area mental health services director. *See* N.C. Gen. Stat. § 7B-2501(c). While Section 7B-2502(c) references institutionalization based on consent, or lack thereof, that Section in no way removes or eliminates a trial court's discretion for dispositional alternatives under Section 7B-2501(c), or otherwise requires a trial court to delegate its authority to the area mental health services director. *See* N.C. Gen. Stat. § 7B-2502(c) ("If the parent, guardian, or custodian refuses to consent to institutionalization after it is

recommended by the area mental health [services] . . . director, the signature and consent of the court *may* be substituted for that purpose." (emphasis added)).

Pursuant to N.C. Gen. Stat. § 7B-2501(c), the court has the discretion to "select a disposition that is designed to protect the public and to meet the needs and best interests of the juvenile." N.C. Gen. Stat. § 7B-2501(c). That is precisely what the trial court did here based on the facts of the case, and the testimony provided by the area mental health services director and the juvenile's court counselor. YDC commitment was necessary to address the seriousness of the juvenile's persistent delinquent behavior, hold the juvenile accountable, protect public safety, and allow the juvenile to have rehabilitative treatment. After consideration of the factors in Section 7B-2501(c), the court placed the juvenile in a secure YDC as "the appropriate plan to meet the needs of the juvenile[.]"

Because the trial court was not required to delegate its authority to the area mental health services director, and because the trial court considered the same dispositional alternatives it will on remand, the juvenile has failed to demonstrate that she was prejudiced by the trial court's error.